**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **MGJ,** *et al.* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 17-318** |
| | : | |
| **SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA,** *et al.* | : | |


**KEARNEY, J.**                                                                                      **May 25, 2017**

## AMENDED MEMORANDUM[1]

Courts must sift through a maze of difficult issues when one intellectually disabled student in public high school allegedly sexually assaults another intellectually disabled student. A mother sending her intellectually disabled daughter to public high school relies upon the school district to provide an appropriate public education and protect her from known sexually motivated co-students during school hours. The school district's efforts can be supplemented by private non-profit organizations monitoring her daughter for a defined number of hours a week. Under federal law, the disabled student's challenges to the public school district's educational services are brought in an administrative due process hearing and possibly resolved through compensatory education and adjustments in the student's educational plan. This administrative process can also address steps to protect the disabled student's security moving forward. But these administrative steps required to be exhausted before filing suit do not always offer the full remedies potentially available under federal civil rights statutes and state law.

Today, we study an intellectually challenged young lady's claims for damages under federal and Pennsylvania law arising from an alleged sexual assault by another intellectually challenged student during an allegedly unsupervised lunch break at her public school. The

wrinkle is the young lady exhausted her administrative remedies by settling her challenge to the school district's services in exchange for a limited release but now sues the district and a non-profit private provider of a recently limited number of service hours. Upon review of the district's and private provider's motions, we interpret the limited release on a summary judgment standard to dismiss the specifically identified claims in the limited release but not the remaining unidentified claims. Beyond the release, we find many of her plead claims cannot survive motions to dismiss. In the accompanying Order, we grant the district's and private provider's motions in part with leave to amend to plead facts under Rule 11 possibly stating a supervisory liability civil rights claim against the District.

## I.    Facts alleged in the Complaint.

MGJ is a teenage student in the Philadelphia School District challenged with intellectual disabilities and autism.[2] MGJ's disabilities made her vulnerable to peer-to-peer pressure because she is "not able to say no" and is not "aware of how to handle" sexually charged peer-to-peer situations.[3] She tends to elope from situations and requires frequent redirection.[4] Princess J is MGJ's parent and legal guardian.[5] As alleged, MGJ "was under the direct supervision and custody of" the District, its employees, and Carson Valley Children's Aid.[6]

Carson Valley allegedly receives federal funding and employed a therapeutic support staff ("TSS") worker to provide one-on-one supervision services and life-skills training to MGJ because of her disabilities.[7] Carson Valley provided these services under a contract with the District, and its services to the District were integral to the public education system, purportedly rendering it a "public entity" and an "instrumentality" of the District and the state.[8]

Carson Valley originally provided 38.5 hours of TSS services per week.[9]  For unexplained reasons, during the 2015–2016 school year, Carson Valley's TSS services "were reduced" to only three hours per day, which excluded unstructured times such as lunch.[10]

### A.  Another student sexually assaults MGJ at school during lunch.

In 2016, fifteen-year-old MGJ attended Swenson Arts and Technology High School in Philadelphia.[11]  On February 18, 2016, during lunch, another student approached MGJ while unsupervised and lured her outside through an unlocked door in the lunchroom.[12]  School officials did not properly supervise the exit.[13]  Once outside, the student removed MGJ's pants and underwear and sexually assaulted MGJ.[14]

After the assault, MGJ never returned to Swenson, and she missed four months of school.[15]  When Extended School Year services began in the summer following the assault, the District placed the assailant in the same classroom as MGJ.[16]  MGJ ultimately transferred to a more restrictive school setting further from her home.[17]

### B.  Earlier instances of students' sexual misbehavior at the school.

According to MGJ, the District knew about the assailant's sexually exploitative tendencies at the time the District and its employees placed her in the same room with the assailant on February 18, 2016 without supervision because Ms. J had complained about the assailant attempting to seduce MGJ on previous occasions.[18]  During the 2014–2015 school year, MGJ told Ms. J the assailant showed her his penis and tried to have her touch it.[19]  Ms. J reported this conduct to MGJ's teacher Lisa Lynch, who admitted seeing "something going on" but did not know what.[20]  In January 2016, MGJ told Ms. J she saw other students in her program inappropriately touching and showing genitals in the library.[21]  Ms. J reported this information to Ms. Lynch, who responded, "Wow.  I can't believe she told you that."[22]

As alleged, the District, Carson Valley, and District employees knew about "sexually inappropriate actions of students in MGJ's program" during the 2014–2015 school year, and knew specifically about the actions of MGJ's assailant, but "actively attempted to conceal" the students' sexually inappropriate behavior from the parents.[23]    District employees Ms. Lynch, Principal Collette Langston, and Special Education Director Jodi Roseman also knew MGJ endured sexual harassment, and they were substantially certain MGJ would continue to be assaulted or harassed if they did not intervene.[24]    Nonetheless, they allegedly failed to prevent the assault despite having the opportunity to intervene.[25]    They also failed to take "appropriate preventative and remedial actions" with respect to the sexual assault and harassment of MGJ.[26]

Shortly after the alleged sexual assault, Carson Valley issued a Comprehensive Biopsychological Re-Evaluation of MGJ.[27]    The report stated MGJ "continues to exhibit elopement risk and concerns" requiring a "support system and prompting/redirection" in the school setting.[28]    The report stated MGJ's elopement behaviors "is seen daily, moderate to severe in intensity, and present for several years."[29]

MGJ alleges Carson Valley should have provided TSS services at the time of the assault.[30]    MGJ does not allege facts regarding Carson Valley's control over the perpetrator or over the environment in which sexual assault/misconduct took place.    All of the alleged sexual misconduct occurred at Swenson High School, not on the premises of Carson Valley.

MGJ does not allege facts as to who decided to place MGJ in an unsupervised setting with her known alleged assailant, but alleges "Defendants" used their authority to place MGJ in a position making her vulnerable to a known risk of harm.[31]

**C. Ms. J filed a Due Process Complaint with the District, resulting in a settlement agreement.**

On July 19, 2016, Ms. J filed a Due Process Complaint against the District with the Pennsylvania Office for Dispute Resolution alleging, among other things, the District violated the Rehabilitation Act[32] and failed to provide a free and appropriate education under the Individuals with Disabilities Education Act ("IDEA").[33]  These proceedings resolved through a September 27, 2016 "Settlement Agreement and Specific Release," providing:

> **1. RELEASE BY PARENT:** Parent, individually and on behalf of [student] for and in consideration of the mutual promises and terms set forth in this Settlement Agreement and Specific Release and other valuable consideration, hereby unconditionally releases and forever discharges the District, its past and present officers, employees, agents, servants and attorneys, the Board of Public Education, the School Reform Commission, their heirs, executors and administrators, successors and assigns ("Releasees") of and from the Released Claims (as defined herein).

> **2. CLAIMS RELEASED:** It is expressly understood and mutually agreed that this Confidential Settlement Agreement and Specific Release are intended to resolve all actions, causes of action, suits, claims, losses, injuries, damages and demands whatsoever, in law or equity, known or unknown, accrued or not accrued, that Parent, individually and on behalf of [student] may have or may ever have had since the beginning of time through the date of this Agreement, including all claims for tuition reimbursement, attorney fees and costs, expert fees and/or compensatory education, *in each case* relating to the education of [student] or the provision (or denial) to her of a free appropriate public education, and arising under and pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA"), and its implementing regulations, 34 C.F.R. Part 300; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulation, 34 C.F.R. Part 104; the Pennsylvania Public School Code of 1949, as amended, 24 P.S. § 951 *et seq.*; Chapters 14 and 15 of the Regulations of the State Board of Education, 22 Pa. Code Ch. 14 & 15 (collectively, the "Released Claims").[34]

As part of the settlement, the District agreed to pay reasonable attorney's fees and costs to Joseph Montgomery, Esq., "for time expended and costs on this matter to the date of this

Agreement."[35]  The release carved out an exception for this claim, providing "[n]othing in this Agreement shall be construed as a release by Parent of . . . any claims relating to the enforcement of this Agreement."[36]  Despite this agreement to pay fees, the District did not pay Mr. Montgomery's fees.[37]

MGJ, by and through her parent Ms. J, then sued the District, school district employees Ms. Langston, Ms. Roseman, Ms. Lynch, as well as Carson Valley and John Does 1 through 10.[38]  MGJ sued the District and Carson Valley for violating Title IX of the Education Amendments of 1972.[39]  She sued all Defendants for claims of state-created harm under 42 U.S.C. § 1983, §1983 failure to train or supervise, intentional infliction of emotional distress, failure to accommodate under Title II of the Americans with Disabilities Act ("ADA"),[40] and violations of section 504 of the Rehabilitation Act.[41]  MGJ also sued Carson Valley, Mrs. Langston, Ms. Roseman, and Ms. Lynch for negligence, and claims the District, Mrs. Langston, Ms. Roseman, and Ms. Lynch breached fiduciary duties.  Lastly, she sued the District under the IDEA for breach of contract arising from the District's failure to pay reasonable attorney's fees.

## II. Analysis

Defendants move to dismiss, arguing MGJ released her claims on September 27, 2016 and fails to state a claim to which relief can be granted.[42]  The District and the individual District Defendants attached a portion of this settlement agreement to their response.[43]  Carson Valley joined in the District's motion, arguing the release also bars MGJ's claims against Carson Valley.[44]  Having provided notice, we exercise our discretion under Federal Rule of Civil Procedure 12(d) to convert Defendants' motions to dismiss to motions for summary judgment under Rule 56, but only as to the noticed issues of Defendants' affirmative defense of release, and we allowed the parties to submit additional materials pertinent to this issue.[45]  MGJ

submitted an affidavit from her attorney Zachary Meinen, swearing he had multiple communications with the District over the course of drafting this settlement agreement and at no time did the District's General Counsel assert or imply this settlement agreement barred MGJ's present claims about the District.[46] Attorney Meinen swears the settlement agreement is not a general release, but "a limited, special release of [free appropriate public education]-related claims of Plaintiffs under specified federal and state statutes and regulations."[47]

We grant in part Defendants' motions and dismiss the Rehabilitation Act claims against the District, the individual District Defendants (Ms. Roseman, Ms. Langston, and Ms. Lynch), and Carson Valley as barred by the release. We dismiss all §1983 claims against the individual District Defendants and the District. We dismiss as duplicative Title II ADA official capacity claims against the individual District Defendants. We dismiss MGJ's negligence claims against the individual District Defendants as barred by statutory immunity. We dismiss the Title II ADA claim against Carson Valley because it is not a public entity. We also dismiss all §1983 claims against Carson Valley because it is not a state actor. We dismiss the Title IX claim against Carson Valley because it lacked substantial control over the harassment and environment in which the harassment occurred.

MGJ may proceed on her IDEA breach of contract, Title IX, ADA, and state law claims against the District. She may also proceed on her state law claims except negligence against the individual District Defendants. MGJ may proceed against Carson Valley on her state law claims.

## A.  The release bars some, but not all, of MGJ's claims against Defendants.

MGJ's release does not bar all of her claims. Under Pennsylvania law, we interpret general releases by the rules of contract construction.[48] We interpret unambiguous releases as a matter of law.[49] When construing a release, our goal is to "give effect to the intentions of the

parties"[50] based on the "ordinary meaning" of the release's language.[51] "[A] release covers only those matters which may fairly be said to have been within the contemplation of the parties when the release was given."[52] A party's subjective intent is irrelevant, and absent fraud, accident, or mutual mistake, the language of the agreement controls.[53] "[A] party cannot avoid the clear language of a release by stating that he or she did not intend to release a particular claim."[54] Our role is to look within the "four corners" of the agreement to determine whether the agreement is unambiguous, *i.e.* subject to only one reasonable interpretation.[55]

  i. **MGJ released her claim under Section 504 of the Rehabilitation Act against the District and individual District Defendants.**

MGJ and the District agreed to a specific release. The agreement itself is labeled a "Specific Release" which encompasses "all . . . claims . . . that Parent, individually and on behalf of [student] may have or may ever have had since the beginning of time through the date of this Agreement, including all claims for tuition reimbursement, attorney fees and costs, expert fees and/or compensatory education, ***in each case*** relating to the education of [student] or the provision (or denial) to her of a free appropriate public education, and arising under" certain identified state and federal statutes and regulations.[56] The clause beginning with "including" is a nonrestrictive relative clause, separated by commas, which neither expands nor limits the scope of released claims. This clause is not essential to the meaning of the rest of the sentence.

We read the release as though the superfluous nonrestrictive clause were omitted. The release narrowly encompasses: (a) all claims which have or could have been brought before the date of the Agreement; (b) in each case (*i.e.* instance) relating to MGJ's education or free appropriate public education; and (c) arising under and pursuant to one of the identified statutes or regulations. This release is unambiguous in terms of the claims released. It does not encompass claims under Title IX, §1983, or the Americans with Disabilities Act. And it

specifically carves out the MGJ's breach of contract claim based on the nonpayment of attorney's fees, as claims "relating to the enforcement of this Agreement" are not released.[57]  But because the release specifically releases claims under Section 504 of the Rehabilitation Act relating to her education, we find MGJ released her claim against the District under Section 504 of the Rehabilitation.  As the release encompasses both the District and its agents/employees, MGJ also released her claims against the individual District Defendants under Section 504 of the Rehabilitation Act.[58]

Defendants' reading of the release is overbroad.  They read the release as encompassing all "damages . . . relating to the education of" MJG, and contend the term "damages" necessarily refers to damages actions under §1983.  This reading is too narrow.  First, damages are recoverable under the released IDEA and the Rehabilitation Act claims, so the reference to damages does not require a broader reading of the release to include other damages claims.  Second, a released claim is not merely a claim "relating to the education" of MGJ, but must satisfy two conditions: a released claim must be a claim (1) "relating to the education of [MGJ] or the provision (or denial) to her of a free appropriate public education, *and* [(2)] arising under and pursuant to" one of the identified statutes or regulations.[59]  Defendants read the release as if "and" means "or," but this construction ignores the syntax of the first condition, which includes claims both "relating to the education *or* the provision (or denial) to her of a free appropriate public education."[60]  Defendants' reading of the release does not give proper weight to the two specified conditions.

### ii.  MGJ concedes Carson Valley is covered by the release, so her claim against it under Section 504 of the Rehabilitation Act is released.

At oral argument, MGJ conceded Carson Valley is covered by the release.  This is consistent with Carson Valley's position it is covered by the release, which applies to "the

District, its past and present officers, employees, agents, servants and attorneys, the Board of Public Education, the School Reform Commission, their heirs, executors and administrators, successors and assigns."[61]  We accordingly dismiss the Rehabilitation Act claim against Carson Valley as released per MGJ's concession.

**B.  Federal law claims against the District and individual District Defendants.**

### i.  We dismiss MGJ's §1983 state-created danger claims against the District and individual District Defendants.

At oral argument, MGJ conceded she only pleads §1983 official capacity claims against the individual District Defendants, which she also conceded are duplicative of her §1983 claim against the District.  Because "[o]fficial-capacity suits are an alternative way to plead actions against entities for which an officer is an agent," we dismiss these official capacity claims as duplicative of her §1983 municipal liability claim against the District.[62]

In her Complaint, MGJ claims the District is directly liable under the state-created danger doctrine.  Although individuals are subject to liability under the state-created danger doctrine, the District cannot be held liable under this doctrine.  Our court of appeals has not squarely addressed whether a municipality is directly liable under the state-created danger doctrine.  The general consensus among the district courts in our circuit is "proving a constitutional violation of state actors under the state-created danger doctrine by itself is not enough to implicate municipal liability."[63]  Rather, courts agree a municipality is liable only to the extent its policies or customs proximately cause a constitutional violation, which MGJ also alleges against the District.[64]  We agree and dismiss MGJ's state-created danger claim against the District.

### ii. We dismiss MGJ's claim against the District for municipal liability under § 1983.

Defendants argue MGJ's claim for municipal liability against the District must be dismissed because MGJ failed to plead facts demonstrating a violation of her constitutional rights under the state-created danger doctrine. We disagree, but dismiss her municipal liability claim against the District for failure to identify specific training or supervision having a causal connection to the violation of her constitutional rights.

In *Monell*, the Supreme Court held a municipality may be liable under §1983 when its policy or custom causes the constitutional violation.[65] To succeed on a *Monell* claim, MGJ must establish: "(1) she possessed a constitutional right of which she was deprived; (2) the municipality had a policy [or custom]; (3) the policy [or custom] 'amounted to deliberate indifference' to her constitutional right; and (4) the policy [or custom] was the 'moving force behind the constitutional violation.'"[66]

### 1. MGJ pleads the violation of a constitutional right.

We first find MGJ establishes a violation of a constitutional right under the state-created danger doctrine. "[P]ublic schools, as a general matter, do not have a *constitutional* duty to protect students from private actors."[67] Nonetheless, MGJ may establish a duty by showing state actors "created or exacerbated a dangerous situation" thereby depriving her of her Fourteenth Amendment right to substantive due process under the state created danger doctrine.[68] To state a claim under the state-created danger doctrine, MGJ must allege:

1. the harm ultimately caused was foreseeable and fairly direct;

2. a state actor acted with a degree of culpability that shocks the conscience;

3. a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's

acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

4. a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.[69]

The individual District Defendants argue MGJ does not satisfy the fourth element's requirement they "affirmatively" used their authority to place MGJ in a dangerous situation. Regarding the fourth element, our court of appeals explained "liability under the state-created danger theory is predicated upon the states' *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger."[70] Courts frequently acknowledge the "inherent difficulty in drawing a line between an affirmative act and a failure to act" because "virtually any action may be characterized as a failure to take some alternative action."[71]

Even so, the Supreme Court and our court of appeals has drawn the line on a number of occasions. The seminal case is *Deshaney*, in which the Supreme Court held for the first time "a State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause."[72] In *Deshaney*, county officials learned about a father's physical abuse of his son, resulting in the county temporarily taking custody of the son before releasing him back to his abusive father.[73] Afterward, a county caseworker visited the home monthly and observed suspicious injuries but did nothing.[74] Hospital personnel also notified the caseworker about suspicious injuries on numerous occasions.[75] Tragically, the father beat his son into a life-threatening coma, causing permanent brain damage.[76] The Supreme Court dismissed the claims against the county and county officials, holding "the State had no constitutional duty to protect [the son] against his father's violence," and their failure to act did not violate the Due Process Clause.[77]

In a case somewhat analogous to ours, our *en banc* court of appeals held two female students failed to allege violations of the state created danger doctrine against school officials for sexual harassment and molestation by other students.[78] The plaintiffs alleged male students molested the female plaintiffs in a unisex bathroom and darkroom which were part of a graphic arts classroom supervised by a student teacher.[79] The teacher experienced difficulty controlling the class and witnessed nonsexual offensive touching in the classroom.[80] The court found insufficient evidence under the state-created danger doctrine because the school officials' purported affirmative acts did not foreseeably render the plaintiffs more vulnerable to a sexual harm: "The school defendants' 'acts' in assigning [a student teacher] to the graphic acts class and failing to supervise her more closely, as well as their failure to put a stop to the non-sexual pandemonium" did not create the foreseeable risk of the sexual harm suffered by the plaintiffs.[81] The court explained the "[p]laintiffs' harm came about solely through the acts of private persons."[82] In other words, the school defendants did not engage in affirmative acts creating the foreseeable risk of sexual harm experienced by the plaintiffs.

Similarly, in *Morrow v. Balaski*, our court of appeals held school officials did not engage in affirmative acts creating or enhancing a danger to plaintiffs experiencing bullying by another student.[83] The plaintiffs argued the school officials' affirmative act consisted of its decision to suspend the bully instead of expelling her and its subsequent decision to permit the bully's return to school following the suspension (*i.e.* failure to expel).[84] Our court of appeals rejected this argument, characterizing it as an attempt "to redefine clearly passive inaction as affirmative acts."[85] If a "failure to expel" constituted an affirmative act, "every decision by school officials to use or *decline to use* their authority, disciplinary or otherwise, would constitute affirmative conduct that may trigger a duty to protect."[86] Although the suspension constituted an affirmative

act, the court disagreed the suspension "created a new danger" for the plaintiffs or "rendered them more vulnerable to danger than had the state not acted at all."[87]

Alternatively, in *L.R. v. School District of Philadelphia*, our court of appeals held a teacher's decision to allow a student to leave school with a stranger (who sexually molested the student) constituted an affirmative act.[88] Rather than focusing on whether to characterize the teacher's act as affirmative action or passive inaction, the court asked whether the teacher's "exercise of authority resulted in a departure from that status quo."[89] In the classroom context, the student's freedom of movement is restricted, and "the teacher acts as gatekeeper."[90] The student was safe in her classroom unless and until her teacher . . . permitted her to leave."[91] The court distinguished the Supreme Court's decision in *Deshaney*, explaining the "Supreme Court's focus in *DeShaney* was on the State's failure to remove [the son] a second time from a situation it had reason to believe was dangerous, meaning the State's decision to leave [the son] with his father was a maintenance of the status quo."[92] The teacher's act of allowing the stranger to take his student without showing proper identification "amounted to an affirmative misuse of his authority" as the student's teacher and gatekeeper.[93]

We find sufficient allegations District employees exercised their authority in a manner resulting in a departure from the status quo. In the school context, students' freedom of movement is subject to the control of school officials. In exercising this authority to control student movement, school officials are reasonably expected to place students in situations where they will not be subject to obvious dangers. This is the status quo.

District employees Ms. Lynch, Ms. Langston, and Ms. Roseman allegedly disrupted this status quo by placing MGJ in the same room as her known assailant. These defendants knew MGJ endured sexual harassment in the past at the hands of the assailant.[94] They placed MGJ in

the same room with the assailant, without adequate supervision, despite knowing the assailant had sexually harassed MGJ in the past. In this context, allowing MGJ to be in the same room as her assailant without supervision is akin to allowing a student to leave the school with a stranger. These allegations are sufficient to show the individual District Defendants affirmatively misused their authority to control student movement. MGJ accordingly pleads a violation of her constitutional right to support her failure to train or supervise claim.

        2. **MGJ does not plead sufficient facts showing the District failed to provide specific training or supervision having a causal connection to her injuries.**

MGJ does not plead a custom of failing to train or supervise. In certain circumstances, the unconstitutional custom can consist of a municipality's failure to train or supervise.[95] "Establishing municipal liability on a failure to train claim under § 1983 is difficult. A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries."[96] Similarly, "a plaintiff asserting a failure to supervise claim must . . . identify a specific supervisory practice that the defendant failed to employ."[97] "Mere proof that an injury could have been avoided if the municipal officer or employee 'had better or more training is not enough to show municipal liability' under a 'failure to train' *Monell* claim."[98] Additionally, merely alleging a failure "to supervise in a way that would have prevented the alleged violation" is insufficient.[99]

MGJ alleges three possible bases for the District's liability for failing to train or supervise: (1) "[F]ailing to properly train and supervise the District's employees as to the risks associated with their action and/or inaction described herein"; (2) "Proper training and supervision in the areas of sexual harassment, bullying and intimidation could have reduced or eliminated the harm"; and (3) the District "violated [MGJ]'s constitutional right to bodily

integrity by failing to properly screen employees and sub-contracted service providers before hiring."[100] As to the first basis, MGJ fails to identify specific training or supervision the District failed to provide. As to the remaining bases, the alleged deficiencies in training and supervision lack a sufficient causal nexus to her injuries. Training its employees in the areas of sexual harassment, bullying, and intimidation would not have prevented MGJ's injury because no employees were present at the time of the injury. Similarly, screening employees and contractors would not have prevented the injury because neither employees nor contractors were present at the time of the alleged assault. Because the District did not require employees or contractors to be present at the time of the assault, no amount of supervision, screening or training of employees or contractors would have prevented the alleged assault.

At oral argument, MGJ explained her municipal liability claim against the District is broader than alleged in the Complaint, encompassing the District's failure to have a policy addressing how to handle students after student-on-student sexual harassment occurs. This claim, however, is not specifically alleged in the Complaint, so we may not consider it at this time. Nor does MGJ allege a failure to train/supervise claim under the related theory the District failed to train its employees on how to handle students after student-on-student sexual harassment occurs. We accordingly dismiss MGJ's §1983 failure to train/supervise claim against the District but grant MGJ leave to amend to plead facts under Rule 11 to possibly state a supervisory liability claim consistent with *Monell*.

### iii. We dismiss MGJ's claims under Title II of the ADA and Section 504 of the Rehabilitation Act as to the individual District Defendants.

Defendants argue the ADA and Rehabilitation Act claims against the individual District Defendants should be dismissed because neither the ADA nor the Rehabilitation Act permit

individual liability.  MGJ responds such claims are viable because—for the purpose of these claims—it sues the individual District Defendants in their official capacities.

We dismiss the Rehabilitation Act claims against the individual District Defendants.[101] Section 504 of the Rehabilitation Act "prohibits discrimination against any qualified handicapped individual under 'any program or activity receiving Federal financial assistance.'"[102]  "Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance."[103]  Although MGJ alleges the District received federal financial assistance, she does not allege the individual District Defendants received such aid.

Even if she did plead they received federal aid, the Rehabilitation Act claims against the individual District Defendants in their official capacities would be duplicative of her Rehabilitation Act claim against the District. We accordingly dismiss MGJ's Rehabilitation Act claims against the individual District Defendants.

We also dismiss MGJ's claims under Title II of the ADA against the individual District Defendants.  Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a *public entity*, or be subjected to discrimination by any such entity."[104]  As MGJ clarifies its ADA claims against the individual District Defendants are in their official capacities, we dismiss these claims as duplicative of her ADA claim against the District.

### C.  Federal law claims against Carson Valley.

#### i.  MGJ fails to plead facts demonstrating Carson Valley is subject to the ADA.

MGJ's claims against Carson Valley under the ADA fail because Carson Valley is not a public entity.  As explained, Title II of the ADA prohibits disability discrimination against

certain individuals by a "public entity."[105]  A public entity is defined as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority."[106]

Our court of appeals has not taken a position in a precedential case as to whether a private corporation providing government services to a public entity under an agreement becomes an "instrumentality" of the state.  In *Matthews v. Pennsylvania Department of Corrections*, our court of appeals held in a nonprecedential opinion "a private corporation is not a public entity merely because it contracts with a public entity to provide some service."[107]  This holding is consistent with the rulings of the courts of appeals for the Second and Eleventh Circuits.[108]  Courts reviewing whether an entity is an instrumentality of the state have concluded the term instrumentality "refers to governmental units or units created by them."[109]  In light of this case law, we find no basis for concluding Carson Valley—a private entity providing TSS services to students in the District—is an instrumentality of the state or otherwise a public entity. We dismiss the Title II ADA claim against Carson Valley.

### ii.  MGJ fails to state a claim against Carson Valley under Title IX.

MGJ's Title IX claim against Carson Valley fails.  Carson Valley argues it is not subject to Title IX because it does not receive federal assistance and did not act with deliberate indifference.  We reject these argument, but dismiss this claim against Carson Valley for another reason: MGJ fails to allege Carson Valley had substantial control over MGJ's school or the assailant.

Title IX prohibits sex-based discrimination "under any education program or activity receiving Federal financial assistance."[110]  Carson Valley argues MGJ fails to allege Carson

Valley received federal funds.  This argument fails at this early stage because MGJ pleads Carson Valley is "a recipient of federal financial assistance."[111]

### 1. MGJ pleads sufficient facts Carson Valley acted with deliberate indifference.

MGJ pleads sufficient facts demonstrating Carson Valley acted with deliberate indifference.  To plead a Title IX claim against Carson Valley for student-on-student sexual harassment, MGJ must plead sexual harassment "that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the [her] educational experience, that [she is] effectively denied equal access to an institution's resources and opportunities."[112]  A school is liable for its "deliberate indifference to known acts of harassment" which have "a systemic effect on educational programs and activities."[113]

As alleged, Carson Valley should have provided MGJ a TSS worker at the time of the assault, which would have prevented the assault from occurring.  MGJ also alleges Carson Valley knew about "sexually inappropriate actions of students in MGJ's program" during the 2014–2015 school year, and knew specifically about the actions of MGJ's assailant, but "actively attempted to conceal" the students' sexually inappropriate behavior from the parents.[114]  Carson Valley also knew MGJ's condition created elopement risks and made her vulnerable to peer-to-peer pressure because she is "not able to say no" and is not "aware of how to handle" sexually charged peer-to-peer situations.[115]  MGJ adequately pleads deliberate indifference in light of Carson Valley's knowledge of MGJ's behaviors and its allegedly deliberate attempts to conceal known acts of sexually inappropriate behavior—by the assailant and other students—despite being responsible for providing therapeutic support services to MGJ.[116]

### 2. MGJ fails to plead facts demonstrating Carson Valley had substantial control over the alleged assailant and the environment in which the assault occurred.

Although MGJ pleads sufficient facts demonstrating Carson Valley acted with deliberate indifference to known acts of harassment, it is not liable under Title IX because it did not have substantial control over the harasser or the environment in which the harassment occurred. A funding recipient cannot be liable for its deliberate indifference "where it lacks the authority to take remedial action."[117] Title IX prohibits sex discrimination "under any education program or activity," and "program or activity" is defined as "the operations of" certain funding recipients.[118] The Supreme Court in *Davis v. Monroe County* explained this language in Title IX requiring the harassment to "occur 'under' 'the operations of' a funding recipient" necessarily requires the harassment to "take place in a context subject to the" funding recipient's control.[119] Liability is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs."[120] For example, when "misconduct occurs during school hours and on school grounds . . . the misconduct is taking place 'under' an 'operation' of" a school.[121]

MGJ seeks to hold Carson Valley—a non-school entity providing TSS services to MGJ through the District—liable under Title IX for conduct occurring outside of Carson Valley by a student who Carson Valley had no apparent control over. MGJ alleges the harassment occurred at Swenson High School. Although Carson Valley allegedly knew about the assailant and his earlier harassment of MGJ, MGJ fails to allege sufficient facts plausibly demonstrating Carson Valley had substantial control over the harasser and the context in which the harassment occurred. We dismiss MGJ's Title IX claim against Carson Valley.

### iii. MGJ's §1983 claims against Carson Valley fail because she does not plead Carson Valley engaged in conduct under color of state law.

Carson Valley argues MGJ's §1983 claims fail because MGJ does not allege facts demonstrating it acted under the color of state law. We agree.

Under §1983, Carson Valley cannot be liable unless it committed the alleged misconduct "under color of state law."[122] For liability under the United States Constitution, Carson Valley's alleged misconduct must have involved "state action."[123] "The 'under color of state law' analysis is equivalent to the 'state action' analysis."[124] MGJ has the burden of proving Carson Valley acted under color of state law.[125]

Under this analysis, the "principal question" is whether there exists a "close nexus" between the state and the alleged misconduct allowing us to conclude the "private behavior may be fairly treated as that of the State itself."[126] Our court of appeals recognizes "three broad tests" for determining whether state action exists: (1) whether the private entity exercised powers traditionally within the "exclusive" prerogative of the state; (2) whether the private entity acted with the help of or in concert with state officials; and (3) whether the state sufficiently insinuated itself into a position of interdependence with the private party rendering it a joint participant in the alleged misconduct, also known as the symbiotic relationship test.[127] Under each test, "the inquiry is fact-specific."[128]

MGJ argues Carson Valley engaged in state action because: (a) it executed a compulsory public function delegated to it by the District; and (b) it jointly participated with the District in an arrangement clothed in the authority of state and federal law.[129] As it is not clear which tests MGJ relies upon, we review Carson Valley's status as a state actor under all three tests but find her allegations insufficient as a matter of law.

### 1. MGJ does not allege facts showing Carson Valley exercised powers traditionally within the exclusive prerogative of the state.

Carson Valley did not exercise powers traditionally within the exclusive prerogative of the state. Whether an entity exercises powers traditionally within the exclusive prerogative of the state depends upon the authority on which the powers are based. For example, in *West v. Atkins*, the Supreme Court held a private doctor contracted with the state to provide prison medical services constituted a state actor because the state had an affirmative obligation to provide adequate medical care to prisoners under the Eighth Amendment.[130] Alternatively, the Supreme Court in *Rendell-Baker v. Kohn* held a private high school providing educational services to maladjusted students at public expense did not constitute a state actor as it related to its employee discharge decisions.[131] Although the school performed a public function funded and required by the state, the state's decision to fund and require these services constituted a "legislative policy choice" which "in no way makes these services the exclusive province of the State," as the state only recently began providing "education for students who could not be served by traditional public schools."[132] "That a private entity performs a function which serves the public does not make its acts state action."[133]

We similarly conclude Carson Valley—in providing TSS support staff services—does not perform a function which has been traditionally the exclusive prerogative of the state. MGJ relies upon relatively recent statutes making schools responsible for providing certain services to disabled students, including the IDEA and Pennsylvania Code provisions. Congress passed the predecessor to the IDEA in 1970,[134] and the Pennsylvania Code provisions cited were adopted on or after 1991.[135] As in *Rendell-Baker*, these legislative policy choices do not make these services the exclusive province of the state.

### 2. MGJ does not allege Carson Valley acted with the help of or in concert with state officials.

MGJ does not allege sufficient facts showing Carson Valley acted in concert with state officials. The Supreme Court has illustrated the "acting in concert" concept on a number of occasions. For example, a private entity acts in concert with state officials when it conspires with those officials to deprive federal rights.[136] This occurred in *Adickes v. S. H. Kress & Co.*, where the Supreme Court found state action because a restaurant employee allegedly conspired with a police officer to deny a restaurant patron services for racially discriminatory reasons.[137]

Additionally, a private entity's acts may be attributable to the state where the actor invokes the aid of state officials to take advantage of state procedures.[138] For example, in *Lugar v. Edmondson Oil Co.*, the Supreme Court held "a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment."[139]

Alternatively, the Supreme Court in *Rendell-Baker* found state officials did not play a comparable role to the public officials in *Adickes and Lugar*.[140] In finding no state action in the private school's decision to discharge a school counselor, the Court noted the state played a "limited role" in the school's personnel decisions.[141] The state employed a committee with the power to review the qualifications of counselors selected by the school to ensure the counselor met the school's grant requirements, but the committee had no authority to discharge a qualified counselor.[142] In other words, the state committee had no involvement in the private school's discharge decision sufficient to fairly attribute the private school's decision to the state.

MGJ fails to allege facts demonstrating Carson Valley acted in concert with the state in connection with its allegedly unconstitutional conduct amounting to liability under the state-created danger doctrine. MGJ does not allege facts demonstrating the Carson Valley and the

District jointly agreed to place MGJ in an unsupervised setting with her alleged assailant. At oral argument, MGJ explained the District—not Carson Valley—has the ultimate obligation to provide TSS services to MGJ. The parties also informed us Carson Valley may have played a role in recommending to a purported state actor the reduction of MGJ's TSS services. These facts, however, are not alleged, and we express no opinion on whether these additional facts would be sufficient to find Carson Valley acted in concert with state officials. On the facts now alleged, Carson Valley did not act in concert with state officials in connection with its allegedly unconstitutional conduct fairly attributable to the state.

### 3. MGJ does not allege facts demonstrating a symbiotic relationship.

MGJ does not allege facts demonstrating the state sufficiently insinuated itself into a position of interdependence with Carson Valley rendering it a joint participant in the alleged misconduct. The classic application of this test is *Burton v. Wilmington Parking Authority*. In that case, the Supreme Court held a private restaurant's racially discriminatory exclusion of patrons constituted state action because the restaurant sat on public property—a parking garage—and the restaurant's rent contributed to the garage.[143] The state, by its inaction, profited from its position of fiscal interdependence with the discriminatory restaurant, making it fair to characterize the state and the restaurant as joint participants.[144]

Although the Supreme Court in *Burton* found a symbiotic relationship based in part on the fiscal interdependence between the restaurant and the state, merely contracting with a public entity does not create a symbiotic relationship. As the Supreme Court in *Rendell-Baker* explained, the fact a private school receives virtually all of its income from government funding does not make its conduct attributable to the state, as the acts of "private contractors do not become acts of the government by reason of their significant or even total engagement in

performing public contracts."[145]  The Court rejected the argument the private school had a symbiotic relationship based on its substantial government funding, stating "the school's fiscal relationship with the State is not different form that of many contractors performing services for the government.  No symbiotic relationship such as existed in *Burton* exists here."[146]

Similarly, in *Crissman v. Dover Downs Entertainment, Inc.*, our court of appeals found no symbiotic relationship between a horse racing track and the state of Delaware even though the state licensed and regulated the track's gambling operations, paid the track a commission to subsidize its gambling operations, and received funds from the track's gambling operations.[147] The court distinguished the Supreme Court's ruling in *Burton* based on its "unique" fact pattern, explaining *Burton*'s application in other contexts "must be so limited."[148]

We similarly conclude MGJ fails to allege a *Burton*-esque symbiotic relationship between Carson Valley and the state.  In arguing a symbiotic relationship exists, MGJ alleges Carson Valley (a) acted under a contract with the District to provide educational services on behalf of the District; (b) staffed a TSS worker for MGJ; (c) conducted a biopsychological re-evaluation of MGJ; (d) supervised and had custody over MGJ; (e) performed services to the District integral to the public education system as an instrumentality of the District and the state; (f) provided one-on-one supervision services and life-skills training to MGJ; and (g) knew about MGJ's abilities.[149]

We do not consider MGJ's conclusory allegation it performed services as an "instrumentality" of the state.  In view of these remaining nonconclusory allegations and the Complaint as a whole, we find no basis to find MGJ plead Carson Valley had a symbiotic relationship with the state.  This situation does not resemble the interdependence present in

*Burton*, as the state does not profit from Carson Valley's allegedly unconstitutional conduct. We accordingly dismiss MGJ's claims against Carson Valley under §1983.

### D. State law claims against the District and individual District Defendants.

#### i. MGJ may proceed on her state law claims against the District and individual District Defendants except for her negligence claims.

The District and individual District Defendants argue they are immune from MGJ's state law claims under Pennsylvania's Political Subdivision Tort Claims Act. Under the Act, local agencies and their employees enjoy immunity in personal injury cases except in eight statutorily enumerated contexts.[150] These contexts include (1) vehicle liability, (2) care, custody or control of personal property, (3) real property, (4) trees, traffic controls and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, and (8) care, custody or control of animals.[151] Although such employees are immune for their negligent acts,[152] they lose this immunity when their conduct constitutes "a crime, actual fraud, actual malice or willful misconduct."[153] It follows the individual District Defendants enjoy immunity as to MGJ's negligence claims.

Statutory immunity does not bar MGJ's claims for intentional infliction of emotional distress against the District and individual District Defendants. This tort requires conduct which would constitute willful misconduct.[154] The District and individual District Defendants enjoy immunity as to the intentional infliction of emotional distress claims.

Similarly, statutory immunity does not foreclose MGJ's claims for breach of fiduciary duty against the District and individual District Defendants. To establish a breach of fiduciary duty under Pennsylvania law, MGJ must prove: (1) Defendants "negligently or intentionally failed to act in good faith and solely for the benefit of" MGJ in all matters for which Defendants were employed; (2) MGJ suffered an injury; and (3) Defendants' failure to act solely for MGJ's benefit "was a real factor in bringing about [her] injuries."[155] Failing to act in good faith, under

certain circumstances, can include "willful rendering of imperfect performance."[156]  It follows Defendants do not enjoy immunity to the extent the claim is based on their intentional failure to act in good faith.  MGJ may proceed on her breach of fiduciary duty claims against the District and individual District Defendants to the extent she seeks to prove a breach through willful conduct.

### ii.  MGJ may not recover punitive damages under her pled §1983 claims.

The District and individual District Defendants argue the punitive damages claim should be dismissed because punitive damages are not permissible under the Rehabilitation Act, the ADA, and Title IX.  MGJ counters punitive damages are recoverable against the individual District Defendants under § 1983.

MGJ may not recover punitive damages against the individual District Defendants under §1983.  As MGJ clarified at oral argument, she sues these school officials in their official capacity.  We dismissed these §1983 official capacity claims as duplicative of her municipal liability claim against the District.  We also point out punitive damages are not recoverable against a municipality.[157]  Although punitive damages are not recoverable against the individual District Defendants under the pled federal claims, we express no opinion on their punitive damages liability under state law.

### E.  State law claims against Carson Valley.

#### i.  MGJ states a claim for intentional infliction of emotional distress claim against Carson Valley.

Carson Valley argues MGJ's intentional infliction of emotional distress ("IIED") claim fails because MGJ does not allege extreme or outrageous conduct.  To state a claim for IIED, MGJ must plead: (1) extreme and outrageous conduct (2) intentionally or recklessly (3) causing

emotional distress (4) which must be severe.[158]  It is our responsibility to determine if the alleged

conduct pleads the requisite level of outrageousness.[159]

For conduct to be outrageous, it "must be so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized society."[160]  "Generally, the case is one in which the recitation of

the facts to an average member of the community would arouse his resentment against the actor,

and lead him to exclaim, 'Outrageous.'"[161]

Courts are split on whether an IIED claim is appropriate in the context of student abuse at

school.  For example, in *Doe v. Allentown School District*, the court held the school district

defendants could not be liable for IIED for covering up multiple sexual assaults of students by

another student because the district defendants did not intend to harm the children.[162]

Alternatively, in *Vicky M. v. Northeastern Educational Intermediate Unit 19*, the court allowed

the IIED claim to proceed against the school district defendants who received repeated warnings

of a teacher's physical and emotional abuse of autistic students.[163]

MGJ adequately pleads outrageousness.  MGJ alleges Carson Valley should have

provided MGJ a TSS worker at the time of the assault, which would have prevented the assault

from occurring.  MGJ also alleges Carson Valley knew about "sexually inappropriate actions of

students in MGJ's program" during the 2014–2015 school year, and knew specifically about the

actions of MGJ's assailant, but "actively attempted to conceal" the students' sexually

inappropriate behavior from the parents.[164]  Carson Valley also knew MGJ's condition created

elopement risks and made her vulnerable to peer-to-peer pressure because she is "not able to say

no" and is not "aware of how to handle" sexually charged peer-to-peer situations.[165]  A jury

could find outrageousness considering Carson Valley allegedly knew about MGJ's disabilities

rendering her more susceptible to elopement and Carson Valley's allegedly deliberate attempts to conceal known acts of sexually inappropriate behavior—by the assailant and other students—despite being responsible for providing therapeutic support services to MGJ. MGJ may proceed on her IIED claim against Carson Valley.

### ii. MGJ states a claim for negligence against Carson Valley.

To allege a negligence claim, MGJ must establish: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages."[166] Carson Valley argues it owed no duty to MGJ, its alleged negligence did not cause harm to MGJ, and the sexual assault was not a foreseeable consequence of Carson Valley's alleged negligence.

MGJ adequately pleads Carson Valley had a duty to MGJ. "The nature of the duty which is owed in any given situation hinges primarily upon the relationship between the parties at the time of the plaintiff's injury."[167] "Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution."[168] Given Carson Valley's therapeutic relationship with MGJ based on MGJ's known disabilities, it is fair to find Carson Valley had a duty of care to avoid harming MGJ by its own negligence.

MGJ also adequately pleads causation and proximate causation. Because Carson Valley knew about MGJ's elopement risks, her susceptibility to peer pressure, and the assailant's and other students' earlier inappropriate sexual conduct, Carson Valley should have reasonably foreseen its failure to provide MGJ a TSS worker during lunch hours would result in MGJ eloping with another student who would sexual assault her. MGJ may proceed on her negligence claim against Carson Valley.

### iii. MGJ may proceed on her punitive damages claims against Carson Valley.

Carson Valley argues MGJ fails to plead sufficient facts to support her punitive damages claim. MGJ counters she pleads sufficient facts to support her punitive damages claim against Carson Valley.

MGJ pleads sufficient facts to proceed on her punitive damages claim as it relates to her state law claims against Carson Valley. In Pennsylvania, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."[169] In determining the propriety of punitive damages, "the state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious."[170] To sustain a claim for punitive damages, MGJ must plead: (1) Carson Valley "had a subjective appreciation of the risk of harm to which [MGJ] was exposed" and (2) Carson Valley "acted, or failed to act, as the case may be, in conscious disregard of that risk."[171]

MGJ's allegations are sufficient to satisfy the requirements of a punitive damages claim against Carson Valley. She alleges Carson Valley actively attempted to conceal sexual misconduct of other students, including MGJ's assailant. She also alleges Carson Valley reduced its provision of TSS services despite knowing of these concerns and knowing MGJ's disability caused elopement risks and rendered her susceptible to peer pressure. Given these allegations, MGJ adequately pleads facts demonstrating Carson Valley consciously disregarded the risk another student would sexual assault MGJ. MGJ may proceed on her punitive damages claim as relevant to her state law claims against Carson Valley.

### III. Conclusion

We grant in part Defendants' motions and **dismiss** the Rehabilitation Act claims against the District, the individual District Defendants, and Carson Valley as barred by the release.

We **dismiss** all §1983 claims against the individual District Defendants, Carson Valley and against the District with leave to amend her supervisory liability claim against the District. We **dismiss** the Title II ADA official capacity and negligence claims against the individual District Defendants. We **dismiss** the Title II ADA claim and the Title IX claim against Carson Valley.

MGJ may proceed on her IDEA breach of contract, Title IX, ADA, and state law claims against the District.[172] She may also proceed on her state law claims except negligence against the individual District Defendants. MGJ may proceed against Carson Valley on her state law claims.

---

[1] We amend our Memorandum issued earlier today (ECF Doc. No. 23) solely to correct typographical errors in the introduction.

[2] ECF Doc. No. 1, ¶ 2; ECF Doc. No. 1, at p. 27. In the parties' briefing, the parties refer to MGJ as MJG despite the alternative spelling in the Complaint. At oral argument, counsel for MGJ confirmed her initials are MJG. We refer to her as MGJ consistent with her name in the caption until such time the caption is amended.

[3] *Id.* ¶ 23.

[4] *Id.*

[5] *Id.* ¶ 3.

[6] *Id.* ¶ 106.

[7] *Id.* ¶¶ 7, 36, 138.

[8] *Id.* ¶¶ 90, 106, 120.

[9] *Id.* ¶ 21.

[10] *Id.* ¶¶ 7, 21–22.

[11] *Id.* ¶¶ 15, 18.

[12] *Id.* ¶ 19.

[13] *Id.*

[14] *Id.* ¶ 28.

[15] *Id.* ¶ 33.

[16] *Id.* ¶ 37.

[17] *Id.* ¶ 38.

[18] *Id.* ¶ 27.

[19] *Id.* ¶ 42.

[20] *Id.*

[21] *Id.* ¶ 43.

[22] *Id.* ¶ 44.

[23] *Id.* ¶¶ 40–41, 45.

[24] *Id.* ¶¶ 108–09.

[25] *Id.* ¶¶ 109–111.

[26] *Id.* ¶ 111.

[27] *Id.* ¶ 19.

[28] *Id.* at pp. 28–29.

[29] *Id.* at p. 29.

[30] *Id.* ¶ 20.

[31] *Id.* ¶ 83.

[32] 29 U.S.C. § 701, *et seq.*

[33] 20 U.S.C. § 1400, *et seq.*; ECF Doc. No. 1, ¶ 52.

[34] *Id.* ¶ 53; ECF Doc. No. 11-2, ¶¶ 1–3 (emphasis in original).

38 MGJ does not allege whether the John Doe defendants are employees of the District, Carson Valley, or otherwise.  ECF Doc. No. 1, ¶ 8.

39 20 U.S.C. § 1681 *et seq.*

40 42 U.S.C. § 12131 *et seq.*

41 29 U.S.C. § 794 *et seq.*

42 "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burtch v. Millberg Factors, Inc.,* 662 F.3d 212, 220-21 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 678). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).
    The Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679); *see also Burtch*, 662 F.3d at 221; *Malleus v. George*, 641 F.3d 560, 563 (3d. Cir. 2011); *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d. Cir. 2010).
    In deciding a Rule 12(b)(6) motion, we may consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

43 ECF Doc. No. 11-2.

[44] Although Carson Valley argues MGJ's release with the District—a state actor—bars the claims against it presumably because it is an "agent" or "servant" of the District, Carson Valley also argues it is not a state actor.

[45] ECF Doc. No. 15.

[46] ECF Doc. No. 18, ¶¶ 14–15.

[47] *Id.* ¶ 15.

[48] *Harrity v. Med. Coll. of Pennsylvania Hosp.*, 653 A.2d 5, 10 (Pa. Super. 1994) (citing *Flatley by Flatley v. Penman*, 632 A.2d 1342 (Pa. Super. 1993)).

[49] *See Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 469 (Pa. 2006).

[50] *Flatley by Flatley*, 632 A.2d at 1344 (citing *Sparler v. Fireman's Insurance Company of Newark, New Jersey*, 521 A.2d 433 (Pa. Super. 1987) (en banc)).

[51] *Habjan v. Habjan*, 73 A.3d 630, 641 (Pa. Super. 2013) (citing *Harrity*, 653 A.2d at 10).

[52] *Bowersox Truck Sales & Serv., Inc. v. Harco Nat. Ins. Co.*, 209 F.3d 273, 279 (3d Cir. 2000) (quoting *Restifo v. McDonald*, 230 A.2d 199, 201 (Pa. 1967)).

[53] *Id.* at 735.

[54] *Stornaweye Properties, Inc. v. Moses*, 76 F. Supp. 2d 607, 615 (E.D. Pa. 1999).

[55] *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993)).

[56] ECF Doc. No. 11-2, ¶ 2 (emphasis in original).

[57] *Id.* ¶ 3.

[58] *Id.* ¶ 1.

[59] *Id.* ¶ 2 (emphasis added).

[60] *Id.* (emphasis added).

[61] *Id.* ¶ 1.

[62] *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002); *Thourot v. Monroe Career & Tech. Inst.*, No. 14-1779, 2016 WL 6082238, at *8 (M.D. Pa. Oct. 17, 2016).

[63] *Wright v. City of Philadelphia*, No. 10-1102, 2015 WL 894237, at *13 (E.D. Pa. Mar. 2, 2015) (citing *Nawuoh v. Venice Ashby Cmty. Ctr.*, 802 F. Supp. 2d 633, 639 (E.D. Pa. 2011); *M.B. ex rel. T.B. v. City of Phila.*, No. 00-5223, 2003 WL 733879, at *6 (E.D. Pa. Mar. 3, 2003)).

[64] *Id.* (citing *M.B. ex rel T.B.*, 2003 WL 733879, at *6; *Taxioly v. City of Phila.*, No. 97-1219, 1998 WL 633747, at *13 (E.D. Pa. Sept. 10, 1998)).

[65] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

[66] *Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (quoting *City of Canton*, 489 U.S. at 389–91) (brackets omitted).

[67] *Morrow v. Balaski*, 719 F.3d 160, 170 (3d Cir. 2013)

[68] *Id.* at 177.

[69] *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 242 (3d Cir. 2016) (quoting *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006).

[70] *Bright*, 443 F.3d at 282 (quoting *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc)) (brackets omitted).

[71] *L.R.*, 836 F.3d at 242.

[72] *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).

[73] *Id.* at 192.

[74] *Id.* at 193.

[75] *Id.* at 192–93.

[76] *Id.* at 193.

[77] *Id.* at 202.

[78] *D.R. by L.R.*, 972 F.2d at 1374.

[79] *Id.* at 1366.

[80] *Id.*

[81] *Id.* at 1374–75.

[82] *Id.* at 1375.

[83] *Morrow*, 719 F.3d at 164, 178.

[84] *Id.* at 177.

[85] *Id.* at 178.

[86] *Id.*

[87] *Id.* at 178 (quoting *Bright*, 443 F.3d at 281) (brackets omitted).

[88] *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 243 (3d Cir. 2016).

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.* at 244.

[94] ECF Doc. No. 1, ¶¶ 40–41, 45, 108–09.

[95] *City of Canton*, 489 U.S. at 389.

[96] *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (citing *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1030 (3d Cir. 1991)).

[97] *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2000).

[98] *White v. Brommer*, 747 F. Supp. 2d 447, 463 n.42 (E.D. Pa. 2010) (quoting *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 629 (3d Cir. 2007)); *see also City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

[99] *C.H. ex rel. Z.H.*, 226 F.3d at 202.

[100] ECF Doc. No. 1, ¶¶ 96–97.
[101] This holding is alternative to our holding dismissing such claims as barred by the release.

[102] *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986).

[103] *Id.* at 605.

[104] 42 U.S.C. § 12132 (emphasis added).

[105] 42 U.S.C. § 12132.

[106] 42 U.S.C. § 12131(1).

[107] *Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015).

[108] *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010); *see also Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006).

[109] *Langston v. Milton S. Hershey Med. Ctr.*, No. 15-02027, 2016 WL 1404190, at *11, *31 (M.D. Pa. Apr. 11, 2016) (quoting *Edison*, 604 F.3d at 1310).

[110] 20 U.S.C. § 1681(a).

[111] ECF Doc. No. 1, ¶ 138.

[112] *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 205–06 (3d Cir. 2001).

[113] *Id.* at 206 (quoting *Davis*, 526 U.S. at 633).

[114] ECF Doc. No. 1, ¶¶ 40–41, 45.

[115] *Id.* ¶ 23.

[116] We reject Carson Valley's argument MGJ's allegations regarding its knowledge are conclusory, as conditions of the mind such as knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

[117] *Id.* at 644.

[118] 20 U.S.C. § 1681(a); 20 U.S.C. § 1687(1)–(4).

[119] *Davis*, 526 U.S. at 645.

[120] *Id.*

[121] *Id.* at 645 (citing *Doe v. Univ. of Illinois*, 138 F.3d 653, 661 (7th Cir. 1998)).

[122] *Sprauve v. W. Indian Co.*, 799 F.3d 226, 229 (3d Cir. 2015) (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)).

[123] *Id.* (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

[124] *Id.* (quoting *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005)).

[125] *Groman*, 47 F.3d at 638 (citing *West v. Atkins*, 487 U.S. 42, 48 (1988))).

[126] *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Leshko*, 423 F.3d at 339).

[127] *Id.* (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)).

[128] *Id.* (quoting *Groman*, 47 F.3d at 638) (brackets omitted).

[129] ECF Doc. No. 14-3, at pp. 8, 13.

[130] *West v. Atkins*, 487 U.S. 42, 56 (U.S. 1988).

[131] *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982).

[132] *Id.*

[133] *Id.*

[134] Education of the Handicapped Act in 1970, 84 Stat. 175 (1970); *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005).

[135] 22 Pa. Code § 15.3 (adopted in 1991); 22 Pa. Code § 14.102 (adopted in 2001).

[136] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970).

[137] *Id.* at 157.

[138] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

[139] *Id.* at 941.

[140] *Rendell-Baker*, 457 U.S. at 838 n.6.

[141] *Id.*

[142] *Id.*

[143] *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724–25 (1961).

[144] *Id.*

[145] *Rendell-Baker*, 457 U.S. at 841.

[146] *Id.* at 843.

[147] *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 243 (3d Cir. 2002).

[148] *Id.* at 244.

[149] ECF Doc. No. 14-3, at p. 5.

[150] 42 Pa. C.S. §§ 8541, 8542(b), 8545.

[151] 42 Pa. C.S. § 8542(b).

[152] *Wade v. City of Pittsburgh*, 765 F.2d 405, 412 (3d Cir. 1985).

[153] 42 Pa. C.S. § 8550.

[154] *See Kokinda v. Breiner*, 557 F. Supp. 2d 581, 595 (M.D. Pa. 2008).

[155] *Dinger v. Allfirst Fin., Inc.*, 82 F. App'x 261, 265 (3d Cir. 2003) (quoting *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998)) (brackets omitted).

[156] *Id.* at 266 (quoting *Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716, 722 (Pa. Super. 1996)).

[157] *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

[158] *White v. Ottinger*, 442 F. Supp. 2d 236, 251 (E.D. Pa. 2006) (citing *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. 1997)).

[159] *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1487 (3d Cir. 1990) (citing *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988)).

[160] *Hoy*, 720 A.2d at 754 (quoting *Buczek v. First National Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. 1987)).

[161] *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997).

[162] *Doe v. Allentown Sch. Dist.*, No. 6-1926, 2007 WL 2814587, at *10 (E.D. Pa. Sept. 21, 2007).

[163] *Vicky M. v. Ne. Educ. Intermediate Unit 19*, 486 F. Supp. 2d 437, 462 (M.D. Pa. 2007).

[164] ECF Doc. No. 1, ¶¶ 40–41, 45.

[165] *Id.* ¶ 23.

[166] *Toro v. Fitness Int'l LLC.*, 150 A.3d 968, 976–77 (Pa. Super. 2016) (citing *Estate of Swift by Swift v. Northeastern Hosp.*, 690 A.2d 719, 722 (Pa. Super. 1997)).

[167] *Id.* at 977.

[168] *Campo v. St. Luke's Hosp.*, 755 A.2d 20, 24 (Pa. Super. 2000) (quoting *Brandjord v. Hopper*, 688 A.2d 721, 723 (Pa. Super. 1997)).

[169] *Feld v. Merriam*, 485 A.2d 742, 747 (1984).

[170] *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) (quoting *Feld*, 485 A.2d at 748) (brackets omitted).

[171] *Id.* at 772 (citing *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097–98 (Pa. 1985)).

[172] The District's only argument for dismissing the Title IX claim against it at this stage is based on the limited release. As shown, we do not agree with the District as to the broad scope of the September 27, 2016 release. But we express no opinion on whether the Title IX claim against the District will proceed to the jury.